A. P. BRECHWALD, Appellant, v. R. W. SMALL et al., Appellees.

**FRAUD:** Liability for Fraud—Reliance on Representations—Necessity. One may not rescind a contract of sale or exchange on the grounds of fraud when he did not rely thereon, but did rely on his own personal judgment and examination.

**EXCHANGE OF PROPERTY:** Rescission—Fraud—Diligence. The right to rescind a sale or exchange may be precluded by lack of diligence in asserting the right.

**CONTRACTS:** Rescission—Indivisible Contract. There may not be a *partial* rescission of an indivisible contract.

*Appeal from Humboldt District Court.—N. J. LEE, Judge.*

SATURDAY, JANUARY 20, 1917.

REHEARING DENIED TUESDAY, MAY 22, 1917.

ACTION in equity, to set aside an exchange of lands because of fraud and misrepresentation of the defendants, and to restore to plaintiff the property he conveyed to the defendants, and for other relief. Defendants filed separate answers, Hayden admitting that his codefendant was the owner of the property which was conveyed to plaintiff, he, Hayden, having sold the same to Small, and denying each and every allegation of the petition. Defendant Small denied all allegations of fraud, and admitted that he was the owner of the property which was conveyed to plaintiff. This defendant also averred that plaintiff acted upon his judgment in making the exchanges, examined the land given him, and was satisfied therewith. He also pleaded that plaintiff ratified the exchange after full knowledge of all the facts, and that he has been guilty of such laches as that he should not be heard to complain. Other issues were tendered, which will be noticed as we proceed. The case

was tried to the court, resulting in a decree dismissing plaintiff's petition, and he appeals.—*Affirmed.*

*Healy & Thomas* and *Robert Healy,* for appellant.

*Maurice O'Connor,* for appellees.

DEEMER, J.—Plaintiff was the owner of a small opera house, with the lot upon which it was built, located in Gilmore City, Iowa. Plaintiff and defendant Small both lived in that town, and defendant Hayden, Small's father-in-law, lived at Ruthven, also in this state. Prior to the transaction in question, plaintiff and Small had had some dealings with each other, Brechwald having transferred to Small a restaurant business in Gilmore, theretofore conducted by Brechwald, and a year's lease on the opera house property, the rental of which was estimated at $10 per month. Shortly thereafter, negotiations were had for a trade of the opera house property, by plaintiff to Small, for some land in North Dakota and Minnesota. It seems that Hayden then owned the lands, but that he soon entered into a contract to sell them to Small. Plaintiff dealt with Small as if he were the owner, and, although Hayden deeded the farm lands directly to plaintiff, he (Hayden), save as hereinafter noted, had nothing to do with the exchange. All parties were familiar with the opera house property, but plaintiff had never seen the Dakota or Minnesota lands. Small had never seen the Dakota lands, and claims that he never saw the Minnesota lands, although there is a dispute in the testimony regarding a statement said to have been made by him to the effect that he had seen them. Both the opera house property and the lands were encumbered, the lands being heavily mortgaged, so that nothing but "equities" were the subjects of exchange. There were 160 acres of the North Dakota land, subject to a mortgage amounting to $10 per acre. There were 80 acres of land in Sherburne

County, Minnesota, mortgaged for $20 per acre, and another tract, of 40 acres, in Mille Lacs County, Minnesota, carrying a mortgage of $20 per acre. The opera house property was encumbered by a mortgage in the sum of $3,500. The 280 acres of farm land were encumbered by mortgages approximating $4,000. By the terms of the agreement, as finally consummated, plaintiff was to convey the opera house to defendant Small and to assume the $4,000 on the farm lands, and defendant (or defendants) was to pay the mortgage upon the opera house, convey the farm lands to plaintiff, and also to give him $1,500 in cash.

There is a sharp dispute in the testimony regarding the actual value of each and every piece of property. As already stated, Hayden owned the land when the negotiations began. Small said that he did not know much about this North Dakota land, and that he would write and find out about it. It is claimed that, some little time thereafter, Small produced a letter which he claimed to have secured from Hayden, and that in this letter Hayden represented that "there was a house, granary and other buildings, and that there were between 60 and 70 acres in crop of wheat." Plaintiff's testimony regarding Small's statements as to the Minnesota land was substantially as follows:

"About the Minnesota property, he said that he had 120 acres of land in Minnesota that was worth about $40 or $45 an acre, and that there was a little broke on it that probably hadn't been worked lately. He said that there was a mortgage of $20 an acre on it. He said there were no improvements on it. He said that it was worth $40 or $45 an acre. He said that he had seen the Minnesota land."

Defendant Hayden denied that he ever wrote any letters to Small, or to anyone else, about the land, and none were produced upon the trial. But plaintiff says that Small gave him a letter which purported to come from Hayden,

but that he (plaintiff) lost it. Hayden and Small admit that they talked about the Dakota land at one time while Small was at Ruthven, and that Hayden then said he had never seen the land, but gave Small some information which came to him from others, stating that he knew nothing about it himself. It is not claimed that Small made any statements as of his knowledge, concerning this North Dakota land.

As to the Minnesota land, it is not claimed that any misrepresentations were made regarding the improvements thereon. The charge here is that Small said it was worth from $40 to $45 per acre. Plaintiff testified that Small said he had seen the land, but this is denied by Small. Small was corroborated by two witnesses, each of whom said that they heard Small tell plaintiff that he had not seen either the Minnesota or Dakota lands. As to the North Dakota land, there is no direct testimony that either defendant represented that it was worth $40 to $45 per acre, or any other sum. The strongest testimony with reference to this is that he (Small) priced the land to plaintiff at $40 to $45 per acre. Small says that he priced it at $25 per acre. The statements relied upon by plaintiff, regarding this land, related to the improvements on the land, and to the number of acres in cultivation. The testimony tends to show that this Dakota land was not improved as plaintiff says it was represented to be, and that the number of acres cultivated, or in wheat, was much smaller than is stated by Hayden and Small. There are also statements to the effect that this Dakota land, when traded, was worth from $1,600 to $1,700. As to the Minnesota land, the claimed representations were as to its value; that is, that it was worth $40 to $45 per acre. The testimony tends to show that the lands in Mille Lacs County were worth $12 to $13 per acre, and that the land in Sherbourne County was worth: one 40, $10 to $12 per acre; and the other, from $5 to $15 per acre. The Da-

kota land carried a mortgage of $10 per acre, and the Minnesota land mortgages amounted to $20 per acre. In making the exchange, it is evident that fictitious values were placed upon all of the property. It was stated in the agreement of exchange that the opera house property was put in at $18,000, although the testimony shows that, even for trading purposes, the opera house was put in at $7,200, the defendant assuming a mortgage thereon of $3,500, making a total value of $10,700. The testimony regarding its actual value at that time is very conflicting. Some of the witnesses say it was not worth, unincumbered, more than $6,000 or $6,500, while others say it was worth from $15,000 to $16,000. It will be observed, from what has already been stated, that defendant was to pay plaintiff $1,500 in cash, which, as we understand it, was paid. Small was to have possession of the opera house under the lease he then held, without paying any rent to plaintiff, and defendant Small also assumed and agreed to pay the mortgage upon the property.

If the case stood alone upon the issue of fraud and deceit, we would have some difficulty in finding any actionable fraud on the part of either defendant. Neither had seen the lands, and there is some doubt at to whether Hayden ever wrote a letter such as is claimed by plaintiff. Hayden and Small did talk over the matter, and Hayden repeated to Small what he had heard from others regarding the lands, their value and the improvements thereon. We are in considerable doubt, under this record, as to whether Small did more than repeat to plaintiff what Hayden told him, at the same time saying that this was a second-hand report, based upon information received from Hayden, he (Hayden) having no knowledge as to the facts; but, as we are of opinion that the case must be made to turn on another proposition, we should dismiss the claim of fraud and de-

ceit as to either parcel of land and go directly to what we regard the turning point in the case.

1. FRAUD: liability for fraud: reliance on representations: necessity.

For some reason, and doubtless because none of the parties connected with the transaction had ever seen either the Dakota or Minnesota land, the written papers executed to evidence the transaction were left with a banker at Gilmore, and it was agreed that they should not become effective until plaintiff had an opportunity to examine the farm land.. The great preponderance of the testimony shows that the papers were left with the banker, plaintiff reserving the right to go and look at these lands before proceeding further, and if, on inspection, he concluded not to accept the same, he had the right to cancel the deal and reject the proposition. Pursuant to this agreement, plaintiff went to Minnesota and examined at least one of the tracts. After returning, he said the lands were satisfactory to him, doubtless referring to the Minnesota lands, for he did not go to look at the Dakota land. His reason for not doing this was that at one time he had lived in Canada, at a place some 80 miles north of the land he was getting in exchange; knew in a general way as to its location, and was content to accept it without examination. This latter proposition is denied by plaintiff, who says that he relied upon Small's representations regarding that land, and did not go to see it because he was short of funds. We need not settle this dispute. It is enough to refer to plaintiff's conduct with reference to the lands after the agreement for the exchange was made. While in Minnesota, and after seeing one of the tracts, he rented some of the hay land on one of these farms and received the rent therefor. After seeing the Minnesota lands and expressing satisfaction therewith, he permitted the deal to go through and had some of the deeds recorded. After the final closing of the deal, plaintiff con-

tracted to sell the Dakota land to one Webber. He received his deeds in July, 1912, and never questioned the deal until September 23, 1913. After plaintiff expressed satisfaction with the deal, defendant Small paid the balance in cash which he agreed to pay, and also paid some liens upon the opera house building, amounting to $750. Plaintiff also borrowed from Small enough to make his total obligations $1,350.

About a year after closing the transaction, plaintiff tried to sell the Minnesota land to strangers. It is quite apparent from this record that, even if defendants were guilty of fraud and deceit, plaintiff was content to rely upon his knowledge and information received regarding the lands, or, after receiving information regarding the Minnesota land, he chose to ratify the deal, or rather, failed to exercise the diligence required of one who claims to have been defrauded. In such cases, the defrauded party is required to act with promptness, and to disaffirm the contract because of the fraud practiced upon him.

To justify rescission of a contract ob-
2. EXCHANGE OF tained by fraud, the party injured must, as
PROPERTY: re-
scission: fraud: soon as he discovers the deceit, or at least
diligence.
within a reasonable time thereafter, disaffirm the contract and demand back his property. The remedy here sought is rescission, and not damages for the fraud; and in all cases of rescission, the party defrauded must act with reasonable promptness after discovering the fraud. The rule is somewhat different in actions to recover damages. Again, this being an action to rescind for fraud, the proof must be clear, satisfactory and convincing. In law actions for fraud, nothing more than a preponderance of the testimony is required. Again, plaintiff could not rescind as to part of the land and hold the other

part. The contract must stand or fall as a whole. This much is said because of plaintiff's claim that he saw but one tract of farm land, and his expression of satis-faction therewith should not bar him of his right to rescind as to the other tract of land, or the entire contract because of fraud as to one of the tracts. Under the testimony, there can be no doubt that plaintiff has ratified the fraud, if there was one, as to part of the Minnesota land. This being true, he cannot say: "Well, I may have to hold this, but I may still recover the opera house property and rescind the deal by deeding back the other farm lands." The propositions on which the decision is made to turn are well established by authority. See, as sustaining the conclusion reached, *Moffitt v. Cressler*, 8 Iowa 122; also cases cited in 20 Cyc. 92, 93 and 94; *Barnes v. Century Savings Bank*, 165 Iowa 141; *State Bank v. Brown*, 142 Iowa 190; *Rawson v. Harger*, 48 Iowa 269; *Evans v. Montgomery*, 50 Iowa 325.

*3. CONTRACTS: rescission: indivisible contract.*

We are satisfied with the decree of the trial court, and, in view of the decided conflict in the testimony, we feel that some weight should be given to the opinion of the trial court, which had all the witnesses before it. The decree must be, and it is,—*Affirmed.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.